**WO**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| United States of America,<br><br>              Plaintiff,<br><br>v.<br><br>$79,010.00 in United States Currency,<br><br>              Defendant. | No. CV-10-0244-PHX-DGC<br><br>**ORDER** |

       The United States moves for summary judgment in this currency forfeiture action. Doc. 52. Pro se Claimant Quezon S. Gray has filed a response in opposition (Doc. 55), and the government has filed a reply in which it also moves to strike Gray's statement of facts and specific exhibits (Doc. 58). Gray has also filed a document titled "motion to dismiss, reply in support of motion for summary judgment, objections and motion to strike, also Government's motion for summary judgment," and a motion to file an amended statement of facts. Docs. 59, 60. The government has filed responses in opposition to these motions. Docs. 62, 63. No party has requested oral argument. For reasons that follow, the Court will grant the government's motion for summary judgment and dispose of the other motions.

**I.    Standard for Summary Judgment.**

       A party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Summary judgment is appropriate if the evidence, viewed in the light most favorable to the nonmoving party, shows "that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Summary judgment is also appropriate against a party who "fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. Only disputes over facts that might affect the outcome of the suit will preclude the entry of summary judgment – the disputed evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

## II.   Civil Forfeiture Legal Standards.

"Summary judgment procedures must necessarily be construed in light of the statutory law of forfeitures, and particularly the procedural requirements set forth therein." *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 979 (9th Cir. 2002).

### A.   The Government's Burden of Proof Regarding Forfeiture.

Under the Civil Asset Forfeiture Reform Act of 2000 ("CAFRA"), "the burden of proof is on the Government to establish, by a preponderance of the evidence, that the property is subject to forfeiture[.]" 18 U.S.C. § 983(c)(1); *see United States v. $80,180.00 in U.S. Currency*, 303 F.3d 1182, 1184 (9th Cir. 2002) ("CAFRA transferred the burden of proof from the claimant to the government and required the government to establish forfeiture by a preponderance of the evidence rather than by the lower probable cause standard[.]"). "[I]f the Government's theory of forfeiture is that the property was used to commit or facilitate the commission of a criminal offense, or was involved in the commission of a criminal offense, the Government shall establish that there was a substantial connection between the property and the offense." 18 U.S.C. § 983(c)(3).

### B.   The Claimant's Burden of Proof.

If the government meets its burden of proof regarding forfeiture, the burden shifts to the claimant to prove, by a preponderance of the evidence, that the currency was not

- 2 -

connected with illegal activity. *United States v. Currency, U.S. $42,500.00*, 283 F.3d 977, 980 (9th Cir. 2002). "'A 'claimant' is one who claims to own the article or merchandise or to have an interest therein.'" *Baker v. United States*, 722 F.2d 517, 518 (9th Cir. 1983) (quoting *$15,500.00 in U.S. Currency*, 558 F.2d, 1359 1360 (9th Cir. 1977), and citing *United States v. One 56-Foot Motor Yacht Named Tahuna*, 702 F.2d 1276, 1279 (9th Cir. 1983)). Possession of the currency at the time of seizure "coupled with a claim of ownership" is sufficient to establish standing to challenge forfeiture at the summary judgment stage. *United States v. $133,420.00*, --- F.3d ---, No. 10-16727, 2012 WL 555987, at *5 (9th Cir. Feb. 21, 2012).

To defeat a civil forfeiture action, a claimant must "show by a preponderance of the evidence that the property was not involved in a violation of the narcotics laws, or [] otherwise refute the government's showing[.]" *United States v. $215,300 in U.S. Currency*, 882 F.2d 417, 419 (9th Cir. 1989); *see also One 56-Foot Yacht Named Tahuna*, 702 F.2d at 1281 (9th Cir. 1983). (a claimant may defeat forfeiture in one of two ways, either by refuting the government's evidence, or by producing affirmative evidence that the property seized was not used or intended to be used for illegal purposes).

CAFRA also contains an "innocent owner" defense. *See* 18 U.S.C. § 983(d). Under this defense, the claimant has the burden of showing he is an innocent owner by a preponderance of the evidence. *Id.* An "innocent owner" is one who "did not know of the conduct giving rise to forfeiture," or "upon learning of the conduct giving rise to forfeiture, did all that reasonably could be expected under the circumstances to terminate such use of the property. *Id.* at § 983(d)(2)(A)(i)-(ii). *See United States v. 493,850 in U.S. Currency*, 518 F.3d 1159, 1170 (9th Cir. 2008) (citing standard).

### III. Gray's Statement of Facts and Supplemental Motion.

The government moves to strike Gray's statement of facts for failure to comply with Local Rule of Civil Procedure 56.1(b). Doc. 58 at 4. The government also moves to strike most of Gray's exhibits as irrelevant, in violation of procedural rules, or inadmissible under the Federal Rules of Evidence. *Id.* at 1-4.

Local Rule 56.1(b) requires that the party opposing a motion for summary judgment submit a separate statement of facts that includes numbered paragraphs corresponding to each of the numbered paragraphs in the moving party's statement of facts and that provides citations to admissible parts of the record to support each of the opposing party's factual assertions. LRCiv 51.1(b). The government argues, and the Court agrees, that Gray has submitted what amounts to an unnumbered narrative of his life that only randomly refers to attached exhibits, largely in support of irrelevant allegations. Doc. 58 at 4; *see* Doc. 56.

After the government filed its reply and pointed out Gray's failure to comply with the Local Rules, Gray filed a motion to amend his statement of facts to comply with those rules. He submitted a new statement of facts in which he inserted numbers before each paragraph and added a notarized signature. Docs. 60, 61. The insertion of numbers having no relation to the government's statement of facts fails, however, to bring Gray's statement of facts into compliance with the Local Rules or to remedy its substantive deficiencies.

The Court will deny the government's motion to strike and grant Gray's motion to amend. The Court will assume, however, that Gray has admitted all facts he does not dispute in his own statement of facts or his response. *See* Fed. R. Civ. P. 56(e). Additionally, where Gray has failed to provide support for factual assertions, the Court will deem those assertions unsupported by the record. *See Martin v. Great Lakes Reinsurance*, 2010 WL 94120, at *1, n.3 (D. Ariz. Jan. 6, 2010).[1]

The Court will not address the government's numerous objections to Gray's attachments because the Court has reviewed these attachments and finds that they do not affect its decision. The Court will therefore deny Gray's objections to the motion to

---

[1] Where a nonmoving party's opposition fails to cite specific materials in the Court's record, the Court is not required to search the entire record for evidence establishing a genuine issue of material fact. *See Carmen v. S.F. Unified Sch. Dist.*, 237 F.3d 1026, 1028-29 (9th Cir.2001); *Forsberg v. Pac. N .W. Bell Tel. Co.*, 840 F.2d 1409, 1417-18 (9th Cir.1988). The Court has nonetheless reviewed Gray's papers with care to identify evidence that supports his position.

strike as moot. Doc. 39. The Court will also deny the rest of Gray's "motion to dismiss, reply in support of motion for summary judgment, objections and motion to strike" (*see id.* at 7-14) because Gray did not file this purported motion pursuant to any recognized rule. The government argues, and the Court agrees, that Gray simply attempts to file a sur-reply that has not been authorized by this Court and to submit additional exhibits after the close of discovery. Doc. 63 at 2.

The Court notes that Gray began this litigation with the representation of counsel and that Gray later signed a statement consenting to counsel's withdrawal. Doc. 21-1. The Court informed Gray in its order approving the withdrawal that he would be required to comply "with all the schedules and obligations in this case." Doc. 23. In its order of March 17, 2011, the Court stated that Gray need not use legal terminology in his pleadings, but reminded Gray that he must "follow the Court's rules of civil procedure." Doc. 36 at 3; *see also* Doc. 51 at 2-3.

**IV.   Background.**

    **A.   The Forfeiture Action.**

On September 3, 2009, Gray was stopped for speeding, while driving a truck and trailer, by Arizona Department of Safety ("DPS") Officer Todd Bentley. Doc. 52-1, ¶¶ 6-8; Doc. 55 at 2. Gray produced a "business only" Florida driver's license, a current insurance card, and a vehicle registration showing that the truck and trailer were registered to a female owner in Florida whom Gray identified as a business partner. Doc. 52-1., ¶¶ 11-16. Gray spoke softly and avoided eye-contact with Officer Bentley. *Id.*, ¶ 17. Gray stated that he had nothing in the trailer, and, when asked why he had travelled from Florida to Phoenix on a business-only license, said he was on his way to pick up a vehicle – later identified as a Nissan Skyline – from an unknown address near a mall in Scottsdale to show in his clothing store in Las Vegas. *Id.*, ¶¶ 17-18, 21-22, 31.

Officer Bentley became suspicious of Gray's travel plans, particularly as Gray had no business cards and did not know the website for his business, was unsure of the location where he was to pick up the alleged vehicle – stating only that he would have to

call someone in Atlanta for the address – and it did not make economic sense to travel from Florida to Phoenix to pick up a vehicle rather than make arrangements with a commercial transport company to do so. *Id.*, ¶¶ 18-20, 28-33.

After issuing a warning and telling Gray he was free to go, Officer Bentley obtained Gray's consent to answer some additional questions. *Id.*, 35-36. Gray told Officer Bentley that he was solely responsible for the contents of the truck and trailer and that there were no illegal drugs, weapons, or large sums of money in either vehicle. *Id.*, ¶¶ 40-44. Gray agreed to a search of the truck and trailer and, upon Officer Bentley's request, read a consent-to-search form aloud and signed it in the presence of Officer Bentley and Officer Jahnz who had arrived to assist with the search. *Id.*, ¶¶ 45-48.

During the ensuing search of the trailer, Officer Bentley noted that the trailer contained no ramp or winch for loading a car, that the trailer was too narrow, particularly near the wheel wells, for someone to drive a car inside and open a door, and that the tailgate was not reinforced to hold a vehicle for transport. *Id.*, ¶ 59. After noting apparent modifications to the front wall of the trailer and an 18" discrepancy between the outside and inside measurement of the trailer's length, Officer Bentley obtained Gray's permission to wait for a drug-sniffing dog to examine the trailer. *Id.*, ¶¶ 60-70. The dog, trained to alert to the scent of marijuana, cocaine, methamphetamine, and heroin, began scratching vigorously at the front wall of the trailer where officers uncovered a hidden compartment, approximately 15" deep, running the entire height and width of the front wall of the trailer. *Id.*, 72-76, 80-81; Doc. 55 at 2. Inside the compartment, the officers discovered a blue duffel bag containing $79,010, divided into seven separate bundles – each banded by rubber bands, wrapped in four layers of plastic bags, and placed inside a black cotton sock. Doc. 52-1, ¶¶ 83-84, 86-87. The compartment also contained a step ladder, a package containing numerous vacuum-seal bags, and a bag of rivets suitable for reattaching the false wall of the compartment. *Id.*, ¶ 88.

The Officers transported Gray and his vehicles to the Happy Valley Maintenance Yard where Gray refused to answer questions, refused to state who owned the currency,

and asked to speak to an attorney. *Id.*, ¶¶ 89, 91, 94; Doc. 55 at 3. Officer Bentley presented Gray with a "Disclaimer of Ownership of Currency or Property," and read aloud the statement,

> I have been advised and understand that by signing this disclaimer of ownership, I am waiving all requirements of notice and any right to notice of seizure for forfeiture and to notice of pending forfeiture relating to this currency or property. This disclaimer is given freely and voluntarily without force or duress to me either direct or indirect.

Doc. 52-1, ¶ 96. Gray signed the disclaimer form and DPS Officer Tony Bread signed as a witness. *Id.*, ¶ 97; Doc. 55 at 5. Gray later submitted a claim in the Drug Enforcement Administration ("DEA") forfeiture action claiming that he owned the currency and had earned it over a five year period of employment and self-employment and that he signed the waiver under duress. *Id.*, ¶¶ 105-108; *see* Doc. 10.

**B.     Gray's Prior Drug History.**

Gray previously had currency seized from him during a traffic stop on August 8, 2008 in Cleburne County, Alabama. Doc. 52-1, ¶ 104, Doc. 25-1 at 18. According to a DEA report, Gray was driving a white Toyota Truck on Interstate 20 when Alabama State Trooper Darrell Seymour pulled him over for following another vehicle too closely and for impeding the flow of traffic. Doc. 25-1 at 19.[2] Trooper Seymour approached the vehicle, which contained two other occupants, and smelled a strong odor of marijuana coming from inside. *Id.* Gray refused to make eye contact, was evasive about where he was going, and looked down and did not answer questions. *Id.* Trooper Seymour received permission to search the vehicle and all three occupants. *Id.* at 20. Trooper Seymour found a bag of marijuana on one of the passengers. *Id.* Trooper Seymour also found a wallet and several small rubber bands in Gray's pocket and a blue nylon bag in the front of his pants. *Id.* Gray attempted to grab the bag and run, and when Trooper Seymour secured him and asked what was in the bag, he looked down and refused to

---

[2] Gray attached the same DEA report as Exhibit L in his opposition motion. *See* Doc. 57 at 81-84.

answer. *Id.* Trooper Seymour found that the bag contained two bundles of U.S. currency wrapped in rubber bands, amounting to $20,000. *Id.* Gray said he did not know who the money belonged to. *Id.* Later, Gray said the money was his and that he dealt with a lot of cash in his business of buying and selling items on the internet. *Id.* The money was turned over to the DEA and administratively forfeited when Gray did not file a claim for the currency. Doc. 52-1, ¶ 104.

Gray was also arrested on November 13, 2008 for conspiracy to distribute dangerous drugs, misconduct involving weapons, possession of marijuana, and possession of marijuana for sale. Doc. 52-1, ¶ 101, Doc. 1, ¶ 95, admitted in Doc. 7, ¶ 24. The arrest occurred pursuant to a wire-tap investigation of an organization suspected of transporting large quantities of marijuana. Doc. 52-1, ¶ 102. Gray was found hiding in the attic of a home containing over five hundred pounds of marijuana plus scales and equipment used to ship marijuana. *Id.* He was subsequently convicted of conspiracy, illegally conducting an enterprise, possession of marijuana for sale over the threshold, and possession of drug paraphernalia. *Id.*

Gray does not dispute the facts in either of these incidents. He disputes only that he was actually involved in illegal drug activity. Gray claims he was unaware that the passenger in his truck was carrying marijuana. Doc. 61, ¶ 7. He also claims that he was wrongly convicted on circumstantial evidence when he was arrested in November of 2008. Doc. 61, ¶¶ 14-15. The Court will discuss these arguments in relation to Gray's burden of proof below.

**V.     Discussion.**

    **A.     The Government's Burden of Proof.**

The government alleges that the seized currency is subject to forfeiture under 21 U.S.C. § 881. Doc. 52 at 11. Money is subject to forfeiture under § 881(a)(6) if it is "(1) furnished or intended to be furnished in exchange for a controlled substance; (2) traceable to such an exchange; or (3) used or intended to be used to facilitate a violation of federal drug laws." *United States v. $191,910 in U.S. Currency,* 16 F.3d

1051, 1071 (9th Cir.1994), *superseded by statute on other grounds*.  To determine whether the government has met its burden of showing that the currency was more likely than not substantially connected to the commission of a drug offense, *see* 18 U.S.C. § 983(c)(1),(3), the Court must look to the totality of the circumstances, *see $42,500.00*, 283 F.3d at 980 (the determination is based on the aggregate of facts, including circumstantial facts).  The government may include evidence gathered after the filing of the forfeiture complaint.  18 U.S.C. § 983(c)(2).

The government bases its allegations upon multiple undisputed facts, including the discovery of a large quantity of cash, Gray's concealment and packaging of the currency, Gray's lack of documentation to support his claim that he was travelling for legitimate business purposes, the positive canine alert, Gray's disclaimer of ownership, and Gray's prior currency forfeiture and drug charges.  Doc. 52 at 4-10.  The government argues that this evidence, taken as a whole, satisfies its burden of proof.

The discovery of large quantities of cash alone is not sufficient to show a connection to illegal drug transactions, but it can be "strong evidence that the money was furnished or intended to be furnished in return for drugs." *United States v. $93,685.61 in U.S. Currency*, 730 F.2d 571 (9th Cir. 1984).  Additionally, travelling with large sums of cash banded by rubber bands and wrapped in several layers of plastic is not consistent with legitimate business activity.  *See United States v. $242,484,* 389, F.3d 1149, 1160-61 (11th Cir. 2004) ("A common sense reality of everyday life is that legitimate businesses do not transport large quantities of cash rubber-banded into bundles and stuffed into packages . . . because there are better, safer means of transporting cash if one is not trying to hide it from the authorities.").  As the government argues, the use of plastic bags and black socks is consistent with efforts to block the odor of drugs and then to conceal the money with an additional opaque, odor-masking covering.  Doc. 52 at 13.  *See United States v. $129, 972 in U.S. Currency*, 129 F.3d 486, 490 (9th Cir. 1997) (linking money wrapped in dryer sheets and plastic wrap with drug activity); *United States v. $42,500*, 283 F3d. 977, 982 (9th Cir. 2002) (finding cellophane wrapping of currency a common

way to conceal odor of drugs); *United States v. $80,010.00 in U.S. Currency*, 2010 WL 580015, at * 2 (C.D. Cal. 2010) ("The bundling of bills with rubber bands and embedding of the bills in the lining of a jacket found in luggage in claimant's possession is further evidence that the funds were furnished in return for drugs."); *United States v. $124,700 in U.S. Currency*, 458 F.3d 822, 826 (8th Cir. 2006) ("[W]e have adopted the common-sense view that bundling and concealment of large amounts of currency, combined with other suspicious circumstances, supports a connection between money and drug trafficking."). Gray's initial denial of knowledge of the money and disclaimer of ownership, though later recanted, also support that Gray was not in possession of the money for legitimate, non-drug related purposes.

The fact that the trailer Gray was pulling was not equipped for transporting an expensive show vehicle – the purpose for which Gray claimed he had travelled from Florida to Phoenix – also suggests that Gray was involved in something other than a legitimate business activity, particularly where Gray provided no evidence to corroborate his business enterprise or even the precise location of the alleged vehicle. The trailer's hidden storage compartment where the canine alerted to the smell of drugs also bears no relation to Gray's stated business enterprise. As the government argues, the size and elaborate concealment of the compartment is, instead, consistent with transporting drugs, as is the presence of numerous vacuum-seal storage bags, a stepladder, and rivets for resealing the compartment. Doc. 52 at 12-13.

Finally, Gray's previous forfeiture of $20,000 and his prior convictions on drug charges are probative evidence that the money in this case was related to illegal drug activity. *See United States v. $22,474 in U.S. Currency*, 246 F.3d 1212, 1217 (9th Cir. 2001) ("Evidence of a prior drug conviction is probative of probable cause"); *United States v. U.S. Currency $83,310.78*, 851 F.2d 1231, 1236 (9th Cir. 1988) (claimant's prior arrests and convictions on drug charges "are circumstances demonstrating more than mere suspicion of his connection with an illegal drug transaction.") Although the cases cited address the probable cause standard rather than the newer preponderance of

the evidence standard, the relevancy of looking to prior drug related activity is without question. Here, Gray's previous currency forfeiture and prior drug convictions provide a nexus to illegal drugs that is consistent with other indications of drug-related purposes for the bundled currency seized from his trailer.

In sum, the Court is persuaded that there is a substantial connection between the money seized from Gray's trailer and a drug trafficking offense. 18 U.S.C. § 983(c)(3). The facts supporting this connection include: (1) the more than $79,000 in cash found in Gray's trailer; (2) the money was packaged in rubber bands, four layers of plastic bags, a sock, and a duffle bag; (3) the money was found in a secret compartment clearly designed for transporting contraband; (4) the compartment included vacuum seal bags typically used in drug trafficking; (5) a drug-sniffing dog alerted to the scent of illegal drugs in the compartment; (6) Gray had been involved in two recent instances of drug trafficking activity; (7) Gray has been convicted on drug trafficking charges; (8) Gray provided a highly implausible explanation to Officer Bentley of his reasons for travelling a long distance with an empty trailer; and (9) Gray immediately disclaimed any interest in the money after it was found. The government clearly has carried its burden in this case.

### B. Gray's Burden of Proof.

Having determined that the government has met its burden, the Court must determine whether Gray has raised a genuine issue of material fact over the government's claim or has provided sufficient evidence to show, by a preponderance of the evidence, that the seized currency was not connected with illegal activity.

Gray does not dispute the factual circumstances surrounding the currency seizure. Instead, he offers alternative explanations for each of the circumstances that the government uses to make its case that the currency was connected to illegal drug activity. Gray explains the distinct packaging of the currency as part of his habitual way of protecting his money. Gray states that he has never saved his money in banks because of the Y2K scare and an unspecified "bank scare" when he graduated from high school in 2000. Doc. 61, ¶¶ 1-2. Gray claims that he habitually converted his paychecks to cash

1  and stored his earnings in his tool box, concealed in black socks so that the presence of
2  the cash would not be obvious if someone looked inside his toolbox. *Id.*, ¶ 21. Gray
3  states that he would transfer the money to hiding places in his home when it reached
4  $10,000 and that he used the socks and airtight plastic bags to keep bugs out. *Id.*

5  Gray similarly offers a number of explanations for why he was travelling with
6  $79,010 locked in a secret compartment of his trailer. Gray states that he purchased the
7  trailer for his mobile "silly t-shirt" business and that he constructed the secret
8  compartment so that he could protect his t-shirt sales earnings when he travelled. *Id.*,
9  ¶ 20. Gray states that he used the secret compartment to store valuable tools and
10 equipment used in his electrical installation business. *Id.* Gray explains the presence of
11 such a large sum of cash at the time he was stopped in Arizona by stating that whenever
12 the trailer was parked at his house he would transfer some of his life savings from his
13 house into the trailer for safe-keeping. *Id.* He states that he would normally remove the
14 money before leaving with the trailer, but that he did not remember to do so before he
15 transported the trailer from Florida to Phoenix in August, 2009. Gray accounts for the
16 presence of vacuum seal bags along with the money in the secret compartment by stating
17 that he previously used such bags in his t-shirt sales business to keep blank t-shirts
18 smelling fresh. Doc. 55 at 17.

19 Taken in a light most favorable to Gray, a number of inconsistencies and flaws in
20 Gray's explanations lead the Court to conclude that a reasonable jury could not find it
21 more likely than not that Gray was carrying the currency in this case for legitimate, non-
22 drug-related reasons. Gray's statements concerning his methods of cashing out all of his
23 paychecks and then sealing the proceeds in layers of plastic covered by black socks are
24 unsubstantiated, and his claim that he never used banks is contradicted by his own
25 statements in response to the government's interrogatories in which he listed five bank
26 accounts, two current and two closed, and stated "there are a few more but that is all I
27 have access to." Doc. 52-1, ¶ 113. Gray does not explain why, if he was concerned
28 about losing his money, he placed it in amounts up to $10,000 at a time in a toolbox

before hiding it in his house, or why he later transferred these sums from his house to a movable trailer that could more easily be stolen or destroyed than a house. Gray does not provide a plausible explanation for why, if he regularly took such elaborate precautions to protect his money, he simply forgot that his life's savings were hidden in the trailer before driving it across the country, or why he had no memory of it being there when Officer Bentley asked if he had a large amount of money. Gray simply makes the unsubstantiated claim that since his motorcycle accident in 2007 his memory "goes and comes sometimes." *Id.*

Gray's explanations about the secret compartment in the trailer are also largely unsubstantiated or implausible. Gray provides no evidence in the form of sales invoices, order forms, or even corroborating testimony to show that he ever had a mobile t-shirt printing business that would explain his alleged need for a secret compartment or numerous vacuum-seal bags. In an apparent explanation of his lack of equipment related to this business, Gray claims that when he returned to Florida, he found that his house had been broken into and all of his garment-printing equipment had been stolen. Doc. 61 at 11. This claim is also entirely unsubstantiated.

Moreover, Gray's explanation that he regularly used the secret compartment to store cash as he collected it during mobile sales and to store equipment he used on job sites is inconsistent with the design of the compartment, which required the removal of a false wall of the trailer and the use of a drill and rivets each time Gray wanted access. Gray offers no plausible explanation for why he would take such elaborate steps to move parts of his life savings out of his house into the trailer when it was not being used for business and then return this money to his house whenever he moved the trailer. Even if Gray believed that this was the best way to store large sums of money, it does not explain why a specially-trained canine alerted to the smell of illegal drugs coming from the compartment.

Gray also fails to raise a genuine issue of material fact about his prior involvement in drug-related activities. Gray disputes that he had any knowledge during his August,

2008 currency forfeiture that his passenger was carrying drugs. The strong odor of marijuana coming from inside the vehicle, Gray's evasive responses to the state trooper, his attempt to run when the officer discovered his pouch of money, and his initial denial that he owned the money all suggest otherwise.

Gray attempts to invalidate his November 2008 arrest and later conviction for drug crimes, including possession of marijuana for sale and possession of drug paraphernalia, by arguing that he was "simply in the wrong place at the wrong time." Doc. 55 at 13. This argument, too, is not consistent with the facts presented. Gray states that he had gone to the vacant home to inspect it for a job of installing a burglar alarm, surveillance system, and phone and entertainment equipment. *Id.*, ¶¶ 8-11. Gray states that he "went into each room of the house" and stood in the middle of each room to visualize the set up for phones, data equipment, televisions, and speakers. Doc. 61, ¶ 10. He claims that he was sleeping on an air mattress in one of the rooms when the police came and that he fled to the attic to "take cover" because it sounded like someone was breaking in and he feared for his safety. *Id.*, ¶¶ 11-12. Gray provides no evidence to corroborate his legitimate business reasons for being in the house. Nor does he explain how, if he went to the house to make a detailed inspection of each room for wiring purposes, he failed to notice the more than 500 pounds of marijuana, scales, and shipping equipment in one of the rooms.

Gray fails to present evidence that would show he obtained the currency from lawful means. In answer to the government's interrogatories, Gray reported that the $79,010 seized on September 3, 2009 was his life savings, built up from a combination of jobs, gifts, and business ventures. Doc. 52-1, ¶ 112. Gray provided a Social Security statement showing earnings from 1998 to 2008 and an IRS transcript showing the income he reported on his tax returns for those years and 2009. Doc. 52-1, ¶¶ 109-110. Gray claims – and the figures he reported to the IRS show – that he earned roughly $249,809 over the eleven years prior to the currency seizure. Docs. 55 at 10; 52-2 at 3. This equals an average of $22,709 per year. It is difficult to believe that Gray could support himself

on such an annual sum and at the same time manage to save more than $79,000 in cash.

Gray provided an unsigned copy of his tax return for 2008, showing that he claimed to have made a net profit that year of $97,221. Doc. 52-2 at 20. The government argues that the figure is unsubstantiated and was manufactured to disguise his drug-related income. Doc. 19 at 23. Gray's reported Social Security earnings for 2008 were $4,263. $150,000 of the amount claimed on his tax return purportedly was business income from selling t-shirts. *See* Docs. 52-2 at 5, line 1; 61 at 4. The government argues that there are several signs of fraud on the tax return, including that he reported exactly $150,000 in gross sales – an implausibly-exact number for t-shirt sales. Doc. 52 at 19. He also reported exactly $6,000 in business expenses, which the government credibly argues is not consistent with the value of t-shirts he would have had to purchase to generate $150,000 in sales. *Id.* Gray provides no record-keeping from his business to back up his claimed amount of sales income or expenses.

Even accepting Gray's figures as true, the government argues that his income for 2008 could not account for the $79,010 because Gray recorded expenses on the same tax return for office expenses, meals and entertainment, and sales, real estate, and other taxes, and reported ownership of a $32,000 Hummer and a $4,800 trailer, presumably purchased with cash because they were not included in his interest deductions. Doc. 52 at 12; *see* Doc. 52-1 at 8; 9-39. The government shows that these expenses, when combined with the loss of $20,000 from Gray's August 2008 forfeiture, would have left Gray with a net profit for the year of only $5,600.88. Doc. 52-2 at 9. Gray disputes only that he purchased the Hummer for $32,000 in cash, claiming that he bought the vehicle on credit in 2007 for a down payment of $2,000 and a monthly payment of $842.22. Doc. 55 at 12. Adding back the full cost of the Hummer and deducting a full year of payments, Gray's post-expense profits for 2008 would equate to roughly $27,500, far less than needed to save more than $79,000 in cash.

The government provides a similar analysis of the figures Gray reported to the IRS in 2009, deducting Gray's recorded expenses for such things as self-employment and

state sales taxes, mortgage interest, and real estate taxes, and showing that Gray had only $1,177 left, with a tax liability of $1,014, for a net income for the year of $163. *See* Docs. 57 at 39-46; 52-2 at 44. These figures do not take into account basic living expenses, principal payments on Gray's home, or principal payments and the cost of gas, insurance, and upkeep on his 2004 Hummer. Moreover, Gray states that he had to depend on "roughly all of the profit" he earned in 2008 to pay the cost of business and living expenses in 2009 due to complications that kept his company, St. Christopher Investments, LLC, from making a profit. Doc. 55 at 10. Taken as a whole, the figures Gray reported on the 2008 tax return and those reflected in his IRS and Social Security records for 2008 and 2009, along with Gray's own statements, suggest that any profits Gray claimed to have made in those years were completely consumed.

Gray fails to produce evidence to show that it was more likely than not that he saved enough money from previous years to account for the currency seized in this case. Gray states that he had saved approximately $10,000 by the time he graduated from high school in 2000. Doc. 61 at 1. Between then and 2007, Gray's IRS records show he reported a total of $133,383 in income, and his Social Security records show $136,707. Gray explains that this discrepancy is due to the fact that he worked for a number of companies during those years, and some did not provide him with W-2's, so he could not report all of his income on his taxes. Doc. 55 at 11. Even taking the higher amount as Gray's income, and deducting the $69,010 that Gray claims to have saved after high school, Gray would have had no more than $67,697, or roughly $9,671 per year over a seven year period, for all living expenses. Although Gray states that his family support and his job incentives allowed him to "not have a mandatory cost of living" so that he could save all his wages (Doc. 55 at 9), he provides no evidence to show that he lived with family members or that his jobs gave him perks or living necessities beyond his paychecks.

Moreover, even if Gray was able to live with very modest expenses, Gray's account of events in 2007 undermine the credibility of his claim. Gray claims that his

income dropped from $31,461 in 2006 to $10,570 because he was in a serious motorcycle accident on April 1, 2007 that caused him to go into a coma and left him unable to work for the last three quarters of the year. Docs. 55 at 9, 61, ¶ 2. Gray states that a few months prior to the accident, he jointly purchased his first house with his uncle. Doc. 61, ¶ 3. He states that his uncle paid all of the closing costs, but that Gray ended up making all of the mortgage payments. *Id.* Gray states that after his accident he took the rest of the year off to recover and spend time with his daughter and to travel to many different cities as a tourist. *Id.*, ¶¶ 4-5. Gray states that he had to "depend on a fraction" of his life savings to get him through the rest of the year. Doc. 55 at 9. This is not consistent with the facts Gray presents. Gray's house payment, alone, assuming he paid at least ten months in 2007, would have amounted to roughly $11,040 for the year, which is nearly $500 more than the $10,570 he reported for total income that year. Gray does not account for utilities, upkeep, homeowner's insurance, furnishings, or other household expenses. Gray also states that he purchased his 2004 Hummer in "late 2007," and that he paid $2,000 down and began making monthly payments of $846.22. Doc. 55 at 11-12. Assuming Gray made at least two payments in 2007, the cost of the Hummer – absent the cost of gas, insurance, and maintenance – would have amounted to an additional $3,692. Gray does not mention any cost associated with his hospitalization and medical care, daily living expenses, care for his daughter, or the cost of his many vacations. Nor does Gray show that he received any help with these expenses other than the money he had accumulated in prior savings.

In sum, Gray's assertion that he lived comfortably off his modest reported earnings and still managed to save $79,010 despite significant injury and loss of work in 2007, not to mention issues with his business that consumed nearly all of his 2008 profits, is simply implausible and unsupported on the record. The only additional income Gray reported in answer to the government's interrogatory regarding gifts, bequests, winnings, or judgments was that Gray claimed to have received tips on his job as a burglary and fire alarm/home automation technician of at least $100 a day. Doc. 52-1, ¶ 111. This also is

completely unsubstantiated.

**C. Conclusion.**

The government clearly has carried its burden of showing by a preponderance of the evidence that there is a substantial connection between the money seized from Gray and a drug trafficking offense. 18 U.S.C. § 983(c)(3). In response, Gray has failed to present evidence that raises a genuine issue of material fact for trial. As already noted, to defeat summary judgment, Gray must present evidence sufficient for a reasonable jury to return a verdict in his favor. *Anderson*, 477 U.S. at 248. Gray has failed to do so, and the government therefore is entitled to summary judgment.

**IT IS ORDERED:**

1. The government's motion for summary judgment (Doc. 52) is **granted**.

2. The government's motion to strike Claimant Quezon S. Gray's statement of facts and exhibits (Doc. 58) is **denied**.

3. Gray's "motion to dismiss, reply in support of motion for summary judgment, objections and motion to strike, also Government's motion for summary judgment" (Doc. 59) is **denied**.

4. Gray's motion for leave to amend his statement of facts (Doc. 60) is **granted**.

5. The Clerk is directed to issue a judgment in this matter.

Dated this 4th day of April, 2012.

David G. Campbell
United States District Judge